UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAVEN DUNCAN,<br><br>  Plaintiff,<br><br>  v.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,<br><br>  Defendant. | No.  2:18-cv-01174-KJM-AC<br><br>ORDER |

    Defendant State Farm Mutual Automobile Insurance Company ("State Farm") moves for summary judgment.  Mot. for Summ. J. ("MSJ"), ECF No. 26.  Plaintiff Raven Duncan opposes.  Opp'n, ECF No. 32.  Defendant replied.  Reply, ECF No. 40.

    The court heard argument on the motion on May 15, 2020 in a telephonic hearing, in light of the coronavirus pandemic.  Rachel Renno appeared for plaintiff, Stephen Ellingson appeared for defendant.  The court now GRANTS in part and DENIES in part the motion.

I. BACKGROUND FACTS

    The following facts derive from both parties' statements of undisputed facts, the parties' responses to those statements, evidence cited in those statements, and the court's review of the record.  *See* Def.'s Statement of Undisputed Facts (Def.'s SUF), ECF No. 27; Decl. of Paul Lehmann, ECF No. 28; Decl. of Stephen P. Ellingson, ECF No. 29; Def.'s Index Ex., ECF No.

1    30; *see also* Pl.'s Statement of Undisputed and Additional Facts ("Pl.'s AUF"), ECF No. 34;

2    Decl. of Raven Duncan, ECF No. 35; Decl. of Rachel Renno, ECF No. 36; Pl.'s Exs., ECF No.

3    37.  Where the court cites directly to defendant's statement of undisputed facts, the facts are

4    undisputed, except where noted.  The court resolves material evidentiary objections with the

5    following recital of facts; to the extent the court relies on a fact, it overrules any objection to it.

6            This case arises from plaintiff Raven Duncan's insurance claim for the theft and

7    burning of her 2008 BMW M3 ("the BMW").  On or about May 26, 2017, plaintiff contacted the

8    Dixon Police Department to report the BMW stolen.  Def.'s SUF 2.  Plaintiff and her husband

9    stated they had been out of town on vacation between May 21 and May 25, 2017.  *Id.*  In the

10   police report, she stated she had locked the BMW and stored the key inside the house before

11   leaving for vacation.  *Id.*  She stated she had only one set of keys; she had lost a second set at the

12   Dixon May Fair earlier in the month.  *Id.*  Defendant State Farm covered the BMW under an

13   insurance policy.  Def.'s SUF 1.  The same day, plaintiff contacted defendant to make a claim

14   under the policy.  Def.'s SUF 3.

15           On June 1, 2017, State Farm took plaintiff's recorded statement by phone.  Def.'s

16   SUF 4.  In the interview, plaintiff told the interviewer she lost a set of keys at the Dixon May

17   Fair.  Def.'s SUF 5.  Plaintiff stated she had financed the car with a purchase price of $42,000 and

18   approximately $32,000 remained outstanding on the loan.  Def.'s SUF 6.  She had gap insurance,

19   which would cover any difference between the actual value of the vehicle and the outstanding

20   amount of the note in the event of a total loss.  *Id.*  In her statement, plaintiff said she and her

21   husband had tried to sell the BMW on Craigslist beginning in September of the previous year.

22   Def.'s SUF 7.  She stated she and her husband were unable to sell the car because prospective

23   buyers "were like lowballing us at $20,000."  *Id.*  Plaintiff told the interviewer she was driving as

24   she gave the statement.  Pl.'s AUF 4.

25           Plaintiff replied "no" to the question, "[a]ny mechanical or electrical issues with

26   the vehicle before it went missing?," in her statement of June 1, 2017.  Def.'s SUF 56, 117.[1]  In

27   ――――――――――――

28   [1] Plaintiff objects that the question calls for expert testimony Mr. Duncan is unqualified to give under Fed. R. Evid. 701(c).  Pl.'s Obj. to Evid. 7, ECF No. 33.  The objection is overruled.  The

response to a question about manufacturer recalls, she stated, "it did have a seatbelt recall […] I guess it's a sensor, uh, that needs to be repaired for that, but I don't know what it involves as far as repair-wise." June 1, 2017 Raven Duncan Statement Tr., Def.'s Index Ex. 3 at 73:7–23.[2]

On June 6, 2017, State Farm took the statement of Nicholis Duncan, plaintiff's husband. Def.'s SUF 8. He stated the vehicle had a mechanical problem with the throttle sensors, with repair costs quoted at $1,800 to $2,400.[3] *Id.* He said "it's just we had too much money going out prior to this[…] [s]o we didn't have the money for the shop right then to fix the throttle…" *Id.* As plaintiff did in her interview, he stated he and plaintiff had tried to sell the BMW on Craigslist, but they were unable to get a suitable price. Def.'s SUF 9, 58, 118. When asked about his financial liabilities, he said he had about $9,000 in credit card debt. Def.'s SUF 10, 59, 119.

On June 7, 2017, defendant obtained a valuation report, which indicated the BMW had a market value of $27,495, assuming no mechanical issues. Def.'s SUF 12, 61, 121.

On June 8, 2017, defendant took another recorded statement from plaintiff. Def.'s SUF 62. She again recounted losing her keys at the Dixon May Fair and described entering the house the night she lost her keys through a dog door. June 8, 2017 Raven Duncan Statement Tr., Def.'s Index Ex. 7 at 108–109. Erin Elkins, the State Farm representative taking plaintiff's statement, elicited the foregoing narrative about the loss of the keys at the Dixon May Fair, the

/////

/////

/////

---

question calls for a statement of plaintiff's understanding of the mechanical state of the car, not the technical substance of any mechanical issue. Fed. R. Evid. 701(c).

[2] References to the Defendant's Index of Exhibits at ECF No. 30 use the Bates numbering in the document rather than the internal pagination of individual exhibits.

[3] Plaintiff objects this was improper expert testimony (Fed. R. Evid. 701(c)) and lacked foundation (Fed. R. Evid. 602). Pl.'s Obj. to Evid. 1. The objection is overruled. Mr. Duncan's statements are not a statement of scientific, technical or other specialized knowledge. To the extent they are offered to show what plaintiff told Mr. Duncan, they are within his personal knowledge.

3

1  circumstances of the BMW's theft and plaintiff's financial condition. *See generally id.* In

2  response to a question about debt, plaintiff stated:

3         MS. DUNCAN: Yeah. I do have, um, student debt loans. Um, I
       went to private school. So it was a little expensive. So I probably
4         have about $50,000, maybe $60,000 in student loan debt. Um,
       obviously, my car, um, the house, um, I have a couple credit cards –
5         two credit cards—

6  *Id.* at 117:22–25, 118: 1–2. Ms. Elkins did not ask about the car's condition during the June 8

7  statement, and plaintiff did not disclose anything further about its mechanical condition. Def.'s

8  SUF 62.

9         On June 21 and 28, 2017, defendant sent letters to plaintiff advising there were

10 questions whether plaintiff or another insured made false statements in connection with the claim

11 and reserving the right to deny the claim. Def.'s SUF 63, 64, 123, 124.

12        On July 5, 2017, defendant sent a letter to plaintiff stating it could not resolve the

13 claim unless it could review records of text messages for plaintiff and Mr. Duncan's cell phones.

14 Def.'s SUF 13. On July 11, 2017, plaintiff emailed defendant text records for herself and Mr.

15 Duncan, prefaced with, "I have attached our text records from sprint.com." Def.'s SUF 14, 66,

16 126. The records showed no text messages between plaintiff and her husband between May 20,

17 2017 and May 26, 2017. *Id.* They showed six text messages on May 24, 2017 between plaintiff

18 and other numbers. *Id.*

19        Plaintiff later furnished a second set of her text records to defendant showing

20 different messages than those in the first set, including several texts on May 24 and May 26, 2017

21 between her and Mr. Duncan. Def.'s SUF 15, 67, 127. The second set of her records showed text

22 messages at the same time as the six messages of May 24 in the first set, but with Mr. Duncan's

23 number instead of the other numbers shown in the first set. *Id.* Plaintiff also submitted a second

24 set of Mr. Duncan's text records containing outgoing texts to plaintiff that were not shown in

25 plaintiff's corresponding incoming text messages. Def.'s SUF 16, 68, 128.

26        On July 26, 2017, defendant received an email from Claims/Research Auto

27 Support Hotline ("CRASH"), which stated the BMW was equipped with "Electronic Drive Away

28 Protection," which would cause the BMW to require a properly electronically coded key before

1   anyone could start it. Def.'s SUF 69. The email states, "There is equipment available that is
2   capable of cloning the keys for this anti-theft system." Pl.'s AUF 24.

3         On August 28, 2017, defendant took plaintiff and Mr. Duncan's examinations
4   under oath ("EUO"). Def.'s SUF 18, 71, 131. Mr. Duncan testified he had a truck payment of
5   $672 per month with over $39,000 owing on the note, as well as $7,200 in credit card debt. *Id.*
6   His monthly income from his employment at CalTrans, his sole source of income, was between
7   $2,250 and $2,900. Def.'s SUF 19, 72, 132. He testified he needed to replace the BMW's
8   throttle body actuators needed at a cost of between $1800 and $2300.[4] Def.'s SUF 20, 73, 133.
9   He stated that Ms. Duncan had been the one to receive the quote for the repair when she had last
10  had the oil changed in the car. *Id.*

11        Mr. Duncan testified he and plaintiff had recently purchased a 2015 Jeep Grand
12  Cherokee to replace the BMW. He had wanted another sports car, but plaintiff had wanted an
13  SUV because they were expecting a child. Def.'s SUF 21, 74, 135.

14        Mr. Duncan testified he was the one who had obtained the first set of text records
15  for both plaintiff and himself by going to Sprint's website and copying the records into an Excel
16  spreadsheet. Def.'s SUF 24, 77, 137. He also stated plaintiff was the one who obtained the
17  second set of records for plaintiff and himself. Def.'s SUF 25, 78, 138. When asked if he could
18  show the examining attorney the text messages between May 24 and 26, 2017, Mr. Duncan
19  explained his phone battery was dead and he did not have a charger. Def.'s SUF 23, 26, 76, 79,
20  136, 139. Mr. Duncan could not explain why plaintiff's second set of text message records
21  showed messages to and from his number that his own second set of records did not include.[5]
22  Def.'s SUF 27, 80, 140.

---

[4] Plaintiff objects this is improper expert testimony. To the extent Mr. Duncan testified to his understanding of the mechanical condition of the car and the quoted cost to repair, rather than the truth of its mechanical condition, the objection is overruled.

[5] Plaintiff objects the question calls for improper expert testimony. A review of the transcript discloses (Examination Under Oath of Nicholis Duncan Tr., Def.'s Index Ex. 15 at 188–89), the question calls for any explanation of the discrepancy rather than an expert opinion. The objection is overruled.

Plaintiff testified at her EUO the couple's monthly mortgage was $2,758. Def.'s SUF 29, 82, 142. She paid $120 per month on a loan for her motorcycle. Def.'s SUF 31, 84, 144. She held $65,000 in student loan debt and $5,000 in credit card debt. Her monthly salary ranged from $5,000 to $8,000. *Id.*

It was in April 2017 that Plaintiff learned she was pregnant. Def.'s SUF 30, 83, 143. Plaintiff testified the couple had purchased the Jeep Grand Cherokee to replace the BMW. Def.'s SUF 33, 89, 149. She stated: "Now that we knew we were pregnant, we would go with something like that," but denied it would be difficult to place a car seat in the two-door BMW. *Id.* She testified that in January through March 2017, she and Mr. Duncan looked at Jeeps, before she learned she was pregnant. Def.'s SUF 34, 90, 150.

She confirmed she and Mr. Duncan had tried to sell the BMW on Craigslist in October 2016. *Id.* She stated for the first time someone had offered her $36,000 for it, "but they were just very rude, and I did not want to deal with them at all." *Id.*

Plaintiff described the throttle sensor issue when asked about mechanical problems with the BMW. Def.'s SUF 32, 85, 145. When asked why she did not disclose the throttle sensor problem in her first recorded statement, she said, "I believe I did tell them there was a throttle sensor out." Def.'s SUF 86, 146.

Plaintiff confirmed the BMW had been locked and the alarm was on after she last drove it. Def.'s SUF 35, 91, 151. There was no glass in the driveway when she discovered it was missing. Def.'s SUF 36, 92, 152.

Plaintiff stated Mr. Duncan had printed the first set of text records. Def.'s SUF 38, 94, 154. She had saved the second set of records as a file to her computer from the Sprint website and agreed to provide the file to the examining attorney. Def.'s SUF 39, 95, 155. When the examining attorney asked her to explain the discrepancy between the two sets of text records, as well as the differences between Mr. Duncan's set and her own, she stated she did not know why they were different, surmising it might be an issue with the Sprint website. Def.'s SUF 40, 96,

/////

/////

156.⁶  During this line of questioning, plaintiff volunteered to show defendant's examining attorney her text messages.  Pl.'s AUF 30.

On August 30, 2017, defendant's examining attorney sent a letter to plaintiff and Mr. Duncan requesting the PDF copy of the records coming directly from Sprint.  Def.'s SUF 41, 97, 157.  The letter also requested screen shots of Mr. Duncan's text messages with plaintiff on May 24 and 26, 2017.  *Id.*

On September 7, 2017, plaintiff forwarded defendant's attorney a "Text Retrieval" from Sprint.  SUF 42, 98, 158.  It showed no texts between plaintiff and Mr. Duncan between May 20 and May 26, 2017.  *Id.*

On November 10, 2017, defendant denied plaintiff's claim on the ground she had made material misrepresentations regarding her text messages.  SUF 44, 100, 160.

The operative insurance policy states, in relevant part:

> 12. **Concealment or Fraud**.  There is no coverage under this policy if *you* or any other *person* insured under this policy has made false statements with the intent to conceal or misrepresent any material fact or circumstance in connection with any claim under this policy.
>
> [. . . ]
>
> 5. **Other Duties Under the Physical Damage Coverages**
> When there is a *loss*, *you* or the owner of the *covered vehicle* must:
> [. . .] d. provide *us* all:
> (1) records;
>  . . .
> that *we* request and allow *us* to make copies"

Def.'s SUF 1, 49, 109 (emphases in original).

After defendant denied her claim, plaintiff filed the instant suit for breach of contract and bad faith.

II.   LEGAL STANDARD

A court will grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

---

⁶ Plaintiff objects the questions in her EUO call for expert testimony.  The objection is overruled; the questions call for an explanation of any kind rather than the specialized knowledge of a qualified expert.

1    The "threshold inquiry" is whether "there are any genuine factual issues that properly can be
2    resolved only by a finder of fact because they may reasonably be resolved in favor of either
3    party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

4    The moving party bears the initial burden of showing the district court "that there
5    is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*,
6    477 U.S. 317, 325 (1986). The burden then shifts to the nonmoving party, which "must establish
7    that there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio
8    Corp.*, 475 U.S. 574, 585 (1986). In carrying their burdens, both parties must "cit[e] to particular
9    parts of materials in the record . . .; or show [] that the materials cited do not establish the absence
10   or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to
11   support the fact." Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[the
12   nonmoving party] must do more than simply show that there is some metaphysical doubt as to the
13   material facts"). Moreover, "the requirement is that there be no genuine issue of material fact
14   . . . . Only disputes over facts that might affect the outcome of the suit under the governing law
15   will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247-48 (emphasis
16   in original).

17   In deciding a motion for summary judgment, the court draws all inferences and
18   views all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at
19   587-88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008). "Where the record taken as a
20   whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine
21   issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv.
22   Co.*, 391 U.S. 253, 289 (1968)).

23   A court may consider evidence as long as it is "admissible at trial." *Fraser v.
24   Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). "Admissibility at trial" depends not on the
25   evidence's form, but on its content. *Block v. City of L.A.*, 253 F.3d 410, 418-19 (9th Cir. 2001)
26   (citing *Celotex Corp.*, 477 U.S. at 324). The party seeking admission of evidence "bears the
27   burden of proof of admissibility." *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir.
28   2002). If the opposing party objects to the proposed evidence, the party seeking admission must

8

direct the district court to "authenticating documents, deposition testimony bearing on attribution, hearsay exceptions and exemptions, or other evidentiary principles under which the evidence in question could be deemed admissible . . . ." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385-86 (9th Cir. 2010). However, courts are sometimes "much more lenient" with the affidavits and documents of the party opposing summary judgment. *Scharf v. U.S. Atty. Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979).

III.  DISCUSSION

    A.  Breach of Contract Claim

Plaintiff's insurance contract excuses defendant's performance if plaintiff or any other insured "has made false statements with the intent to conceal or misrepresent any material fact or circumstance in connection with any claim under this policy." Def.'s SUF 1, 49, 109. Defendant asserts plaintiff made a material misrepresentation in deliberately submitting inconsistent sets of text message records, vitiating its duty to perform under the contract.

In material misrepresentation clauses of this type, a misrepresentation triggering the clause is a "false answer as to any matter of fact, material to the inquiry, knowingly and willfully made, with intent to deceive the insurer." *Cummings v. Fire Ins. Exch.*, 202 Cal. App. 3d 1407, 1416 (1988) (quoting *Claflin v. Commonwealth Ins. Co.*, 110 U.S. 81, 84–86 (1884)).

        1.  Materiality Requirement

Whether a misrepresentation is material "is determined by its probable and reasonable effect upon the insurer." *Mitchell v. United Nat. Ins. Co.*, 127 Cal. App. 4th 457, 474 (2005) (citing Cal. Ins. Code § 334). The test is subjective and viewed from the insurer's perspective. *Sup. Dispatch, Inc. v. Ins. Corp. of New York*, 181 Cal. App. 4th 175, 191 (2010). "[A] statement is not material only if it relates to a matter which ultimately proves to be significant in the ultimate disposition of the claim. Rather, if the misrepresentation concerns a subject reasonably relevant to the insured's investigation, and if a reasonable insurer would attach importance to the fact misrepresented, then it is material." *Cummings*, 202 Cal. App. 3d at 1417 (citing *Fine v. Bellefonte Underwriters Ins. Co.*, 725 F.2d 179, 182–84 (2d. Cir. 1984)) (emphasis

altered). The court may determine materiality as a matter of law "*if* reasonable minds could not disagree on the materiality of the misrepresentations." *Id.* (emphasis in original, citations omitted).

The court finds the inconsistencies when comparing plaintiff and Mr. Duncan's text message records are material. Defendant argues the text messages at issue show an attempt to conceal communications between and among plaintiff, her husband and third parties around the time of the loss. At hearing, defendant's counsel did not articulate a position regarding what the text messages, whichever are accurate, would show. Instead, defendant's counsel argued that when a theft claim is suspicious, insurance companies have a strong incentive to know what the relevant parties were doing and who they were communicating with at the time of the loss. The court agrees. Although defendant does not advance a theory of precisely to whom plaintiff and her husband were communicating, or how any supposed plan was effectuated, defendant is not obligated to bind itself to a particular theory of the misrepresentation's significance for it to be subjectively relevant at the time of the investigation. Plaintiff's pregnancy and need for a more practical car, the couple's substantial financial liabilities, their inability to sell the car at the price they wanted, and the fact that the BMW needed a costly repair tends to show a motive to fabricate a claim. In conjunction with the disappearance of the car without apparent signs of break-in and the timing of the loss of the key, this information is sufficient to support defendant's inference that the couple commissioned the theft of the car to submit a false claim. In this context, plaintiff and her husband's submission of inconsistent text records from the period immediately surrounding the loss is important information for State Farm to evaluate. As a result, such a misrepresentation is material.

2. Scienter Requirement

To succeed in its material misrepresentation defense, defendant would need to show plaintiff made the material misrepresentations at issue with the required intent. However, plaintiff's intent to deceive remains a matter for the jury. Whether a false statement was knowingly and willfully made with knowledge of its falsity and the intent to defraud is a question of fact. *Attah v. State Farm Gen. Ins. Co.*, No. CV 16-07575-GW (PLAx), 2017 WL 3531500, at

10

1  *5 (C.D. Cal. July 31, 2017) (citing *Pedrotti v. Am. Nat. Fire Ins. Co. of Columbus, Ohio*, 90 Cal.
2  App. 668, 671 (1928)).  Where a plaintiff admits to making a false statement with knowledge it is
3  false, the court need not try the issue to the factfinder.  *Cummings,* 202 Cal. App. 3d at 1417-18
4  (insured admitted she had lied); *see also Herbert v. State Farm Mut. Auto Ins. Co.*, 362 F. App'x
5  748, 750 (9th Cir. 2010) (insured's counsel admitted insured knew material statement was false).

6  Here, neither plaintiff nor Mr. Duncan have admitted they knew the text message
7  records were false at the time they submitted them to defendant.  Plaintiff argues she did not
8  review the text records for accuracy prior to submitting them, and thus she was unaware of any
9  inaccuracies.  Plaintiff retained an expert whose report opines the Sprint website is formatted such
10 that it would produce inaccurate records for printing.  Pl.'s Ex. N at 154–155.  While the expert's
11 report lacks foundation as it does not specify which web pages plaintiff provided to him, such a
12 deficiency could be cured before trial.  Plaintiff also correctly points out she cannot be charged
13 with the accuracy of information provided by third parties.  *See* Cal. Ins. Code § 357 (insureds not
14 responsible for accuracy of information provided by third parties to insurer unless third parties are
15 agents acting under a legal duty).  Thus, whether plaintiff provided the false text records is a
16 factual determination for the jury.

17 Defendant asserts plaintiff's effective concession that the first text records were
18 inaccurate, through her provision of a third, accurate set of records, amounts to an admission of
19 her intent.  They cite to *Cummings*, 202 Cal. App. 3d at 1407, for this proposition.  But
20 *Cummings* is distinguishable.  In *Cummings*, the insured plaintiff recanted her earlier narrative of
21 how the loss had occurred, admitting she had been in the insured home when her son had caused
22 the damage.  *Id.* at 1413 n.3.  It was clear under the circumstances the insured in *Cummings* knew
23 the facts of the loss when she made the false representation to the insurance company.  Here,
24 plaintiff asserts the records furnished later were a correction of a mistake noticed after the fact.
25 Unlike in *Cummings*, it is not clear plaintiff knew of inaccuracies in the first and second sets of
26 records at the time she submitted them.  She asserts she did not review them for accuracy or know
27 they were incorrect.  The scienter requirement for a material misrepresentation requires that the
28 representation be made knowingly and willingly.  Later-acquired knowledge that one made a

11

1   misrepresentation does not suffice as a matter of law.  Later attempts to "clean up" a
2   representation may be probative of plaintiff's intent at the time the first and second sets of records
3   were made, but they do not amount to admissions plaintiff knew they were false at the time they
4   were made.  Their significance is a factual question reserved for a jury.

5   Likewise, although defendant does not assert plaintiff's omission of the throttle
6   actuator problem with the BMW is the operative misrepresentation or concealment, she has never
7   admitted she knowingly omitted the throttle actuator issue in her first recorded statement.  In the
8   absence of an admission, defendants have not provided evidence that, if uncontroverted, would
9   establish every element of their misrepresentation defense to the contract.

10   There remains a factual question as to the intent requirement of defendant's
11   material misrepresentation defense to the contract claim.  Therefore, the court DENIES its motion
12   as to the claim for breach of contract.

13   B.  Bad Faith Claim

14   All insurance contracts in California include the implied covenant of good faith
15   and fair dealing.  *Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 573 (1973).  "When benefits are due
16   an insured, delayed payment based on inadequate or tardy investigations, oppressive conduct by
17   claims adjusters seeking to reduce the amounts legitimately payable, and numerous other tactics
18   may breach the implied covenant[.]"  *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 36
19   (1995) (citation, internal quotation marks omitted).  To succeed on a bad faith claim, the insured
20   must show: (1) benefits due under the policy were withheld; and (2) the reason for withholding
21   benefits was unreasonable or without proper cause.  *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th
22   713, 721 (2007).

23   At this stage, whether defendant owed benefits to plaintiff under the policy
24   remains an unsettled question, because as discussed above, the factual question of plaintiff's
25   intent in providing inaccurate text message records is for the jury.  Thus, the court must look to
26   whether defendant's withholding benefits to plaintiff was unreasonable.  Even where benefits are
27   due under the policy, withholding them is not bad faith "if the insurer conducts a 'thorough and
28   fair' investigation, after which there remained a 'genuine dispute' as to coverage liability."  *Bravo*

12

*v. U.S. Life Ins. Co. in City of N.Y.*, 701 F. Supp.2d 1145, 1159 (E.D. Cal. 2010) (citing *Wilson, id.*). "'The genuine issue rule [. . .] allows a court to grant summary judgment when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable– for example, where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California law.… On the other hand, an insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably.'" *Wilson*, 42 Cal. 4th at 724 (quoting *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1161–62 (9th Cir. 2002)). "A dispute is legitimate, if 'it is founded on a basis that is reasonable under all the circumstances.'" *Zubillaga v. Allstate Indemnity Co.*, 12 Cal. App. 5th 1017, 1028 (2017) (quoting *Wilson*, *id.*). The standard of whether a dispute has a reasonable basis is an objective one. *Bosetti v. United States Life Ins. Co. in City of N.Y.*, 175 Cal. App. 4th 1208, 1236–37 (2009).

"While the reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact, it becomes a question of law where the evidence is undisputed and only one reasonable inference can be drawn from the evidence." *Chateau Chamberay Homeowners Ass'n v. Associated Intern. Ins. Co.*, 90 Cal. App. 4th 335, 346 (2001) (citation omitted). Under California law, the genuine dispute doctrine may be applied at the summary judgment stage to purely factual disputes, as appropriate on a case-by-case basis. *Id.* at 348 (citing *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 994 (9th Cir. 2001)). One of the situations in which the question of whether there is a genuine coverage dispute could remain a factual question for the jury, identified in *Guebara* and noted with approval by the *Chateau Chamberay* court, is where the insurer fails to conduct a thorough investigation. *Id.*

Here, even viewing the facts in the light most favorable to plaintiff, there was a genuine dispute regarding whether defendant was obliged to provide coverage at the time it denied the claim. Plaintiff's theory of unreasonableness is that defendant failed to conduct a thorough investigation. "The genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim." *Wilson*, 42 Cal. 4th at 723. "An insurance company may not ignore evidence which supports coverage."

1  *Mariscal v. Old Republic Life Ins. Co.*, 42 Cal. App. 4th 1617, 1624 (1996).  "[T]he
2  reasonableness of the insurer's decisions and actions must be evaluated as of the time that they
3  were made; the evaluation cannot fairly be made in the light of subsequent events that may
4  provide evidence of the insurer's errors."  *Chateau Chamberay*, 90 Cal. App. 4th at 347.
5  　　　　　After State Farm learned of the throttle actuator issue from Mr. Duncan on June 6,
6  the representative who took plaintiff's second recorded statement two days later did not follow up
7  with her to determine whether her failure to mention the issue was intentional or innocent.  Pl.'s
8  AUF 16.  However, the uncontroverted record shows defendant asked about both the mechanical
9  problem and plaintiff's June 1 omission of it in plaintiff's EUO on August 28, 2017.  Def.'s Index
10 Ex., ECF No. 30, Ex. 16, Pl.'s Examination Under Oath, 205–208.
11 　　　　　Additionally, despite plaintiff's repeated mention of her difficulty in printing or
12 obtaining official text records from Sprint, "no one walked her through how to obtain the official
13 records from Sprint, nor did State Farm ask her if they could obtain the records directly from
14 Sprint by providing them access to her account."  Reply at 7; Pl.'s AUF 26, 27.  Nor did State
15 Farm contact the dealers who had serviced the BMW to determine the actual status of the throttle
16 actuator.  Pl.'s AUF 36.
17 　　　　　As for the text messages, under the policy, it was plaintiff's duty to provide
18 defendant with all requested records, receipts and invoices.  Def.'s Index Ex., Ex. A, "State Farm
19 Policy," Insured's Duties ¶ 5(d).  Plaintiff does not advance any authority suggesting defendant's
20 investigation was inadequate for failure to work with Sprint directly or hire an IT expert.
21 Ultimately, defendant not only followed up about the records, but did so assiduously and
22 ultimately directly accessed plaintiff's Sprint account with her permission.  *See, e.g.,* Def.'s SUF
23 49 (defendant's counsel again requesting records produced by Sprint and images of all texts
24 between plaintiff and Mr. Duncan).  In her brief, and again at hearing, plaintiff was unable to
25 articulate what exonerating information would have been revealed had defendant conducted a
26 more thorough investigation.
27 　　　　　Finally, it is not clear why defendant would need to call the dealers who serviced
28 the BMW to determine the actual status of the throttle actuator sensor.  Mr. Duncan disclosed the

BMW had a problem and plaintiff ultimately agreed.  Plaintiff offers no authority for the proposition that defendant's failure to independently confirm the truth of its insured's representation against her interest is an inadequate investigation.

From defendant's perspective, plaintiff had a motive to have the BMW stolen to submit a false claim.  She was upside-down on her loan and unable to resell the car for a price that would satisfy the debt, although she had been trying.  She was pregnant and needed a car more suitable for a family than a two-door coupe.  She and her husband had substantial financial liabilities, including a mortgage payment, student loans, credit card debt and separate truck and motorcycle loans.  And the BMW had a costly mechanical issue.  Had the claim been paid, her gap insurance would have fully satisfied the loan on the BMW.

The circumstances in which the car was stolen were suspicious from State Farm's perspective, as well.  Plaintiff claimed to have lost a set of keys at the Dixon May Fair earlier in the month.  The car was then stolen and wholly burned without apparent signs of a break-in while plaintiff was out of town.  Given the security features of the car, the circumstances suggested it could only have been stolen by use of a key.

Plaintiff argues defendant "ignored the fact that Ms. Duncan did not delete texts from the record around the time of loss and instead just focused on that the records had differences, differences that made no sense for Ms. Duncan to fabricate." Opp'n at 8.  "A trier of fact may find an insurer acted unreasonably if the insurer ignores evidence available to it which supports the claim.  The insurer may not just focus on those facts which justify denial of the claim." *Mariscal*, 42 Cal. App. 4th at 1623.

Although plaintiff claims "State Farm never once tried to obtain information regarding text messages from any other source," Opp'n at 8, she does not dispute defendant's counsel sent an email and letter to the couple following up on their EUOs on August 30, 2017.  That communication reads in part, "Nick, please review your text messages for Raven for May 24, 2017, and May 26, 2017, and if texts are located, please screen shot the texts and email those to [me]." Def.'s SUF 41, 97, 157; Def.'s Index Ex. 18 at 236.  In any event, plaintiff does not argue the disclosure of the third set of accurate text records directly from Sprint to defendant

15

alters the fact that the first two sets of text records had inconsistencies and inaccuracies. The test of whether a genuine dispute existed is not to be made in hindsight. *Austero v. Nat'l Cas. Co.*, 84 Cal. App. 3d 1, 32 (1978). Even if defendant ultimately obtained what it was satisfied were authentic text message records, the earlier inconsistencies would have suggested an attempt to conceal communications relating to the loss under suspicious circumstances. Plaintiff advances no evidence suggesting defendant would have had reason to believe an even more thorough investigation would have dispelled its suspicions, which had a reasonable foundation under the circumstances.

Against this backdrop, plaintiff provided inconsistent records of her text messages occurring on or around the date of the loss and omitted mentioning the mechanical condition of the car in her statements to her insurer. Whether plaintiff knowingly and willingly made a misrepresentation is a question of fact that remains unsettled. However, even if erroneous, defendant's determination plaintiff had made a material misrepresentation was reasonable under these circumstances, and there was a genuine issue as to coverage, precluding a bad faith claim.

Therefore, defendant's motion for summary judgment as to the bad faith claim is GRANTED.

### C. Punitive Damages

A plaintiff who can show by clear and convincing evidence the defendant has acted with malice, fraud or oppressively may recover punitive damages. Cal. Civ. Code § 3294(a). Punitive damages are not available for actions on a contract. *Id.* Here, the court grants defendant's motion as to the bad faith claim, which leaves only the contract claim remaining. Because plaintiff cannot recover punitive damages on the contract claim alone, defendant's motion is GRANTED as to punitive damages.

## IV.  CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED as to plaintiff's second cause of action for bad faith and prayer for punitive damages. This order resolves ECF No. 25.

/////

16

1           The court sets a final pretrial conference for **December 11, 2020** at **10:00 a.m.**
2   The parties are ordered to submit a joint pretrial statement in compliance with E.D. Local Rule
3   281 no later than twenty-one days before the hearing.  If the parties jointly agree to referral to a
4   court-convened settlement conference with another judge of the court, they may request referral
5   in writing at their earliest convenience.
6           IT IS SO ORDERED.
7   DATED: October 13, 2020.

CHIEF UNITED STATES DISTRICT JUDGE